1 | GARRY L. MONTANARI, State Bar No. 89790
WESLEY S. WENIG, State Bar No. 162351
2 | MICHAELIS, MONTANARI & JOHNSON, P.C.
4333 Park Terrace Dr. #100
3 | Westlake Village, CA 91361
Telephone No.: (818) 865-0444
4

Attorneys for Defendant
5 | RED BULL NORTH AMERICA, INC.

6

7

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 NELSON DANIEL FARR BUNKER, individually and as the personal representative of the ESTATE OF MARIA JOHANNA PASSARELLI SCHLESINGER, and as the parent and legal guardian of PHILIP AGNEW FARR, their minor son, and NELSON DANIEL FARR, <br><br> Plaintiffs, <br><br> vs. <br><br> RED BULL NORTH AMERICA, INC., <br><br> Defendants. | ) Case No.: <br> ) <br> ) <br> ) <br> ) <br> ) **NOTICE OF REMOVAL OF** <br> ) **CIVIL ACTION UNDER 28 U.S.C.** <br> ) **SECTION 1331 (Federal Question)** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

22 TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE

23 CENTRAL DISTRICT OF CALIFORNIA:

24     Defendant RED BULL NORTH AMERICA, INC. ("RED BULL") hereby

25 removes this pending action from the Superior Court of the State of California for the

26 County of Los Angeles to this Court, pursuant to 28 U.S.C. section 1331, on the

27 following grounds:

28 ///

# I.  **PROCEDURAL HISTORY**

1.     This is a wrongful death and personal injury action arising from an aircraft accident, which occurred on January 24, 2020 in Iztapa, Guatemala.

2.     This action was commenced on March 30, 2021, by the filing of a complaint in the Superior Court of the State of California for the County of Los Angeles, Case No. 21STCV12165 (hereinafter "the state action"). A true and correct copy of the original complaint is attached hereto, marked Exhibit A and incorporated herein by reference.

3.     One defendant is named in the complaint: RED BULL NORTH AMERICA, INC.

4.     Defendant was first served with a copy of the complaint on April 13, 2021.  Accordingly, this notice of removal is timely filed, pursuant to 28 U.S.C. section 1446(b), within 30 days of service on the defendant of the complaint filed in the State Action.

5.     This action is a civil action of which the Court has original jurisdiction pursuant to 28 U.S.C. section 1331 because this is a civil action "arising under the Constitution, laws, or treaties of the United States."  Accordingly, this action is removable under 28 U.S.C. section 1441(a).

# II.  **ALLEGATIONS OF THE COMPLAINT**

6.     The complaint alleges that on January 24, 2020, plaintiff PHILIP AGNEW FARR suffered personal injuries and decedent MARIA JOHANNA PASSARELLI SCHLESINGER died as the result of being impacted on the ground by an experimental acrobatic aircraft being operated by Steven Andelin. (Exhibit A, complaint, p. 6, ¶22.)

7.     Plaintiffs are a dual citizens of the United States and Guatemala and reside in the State of California. (Complaint, p. 2, ¶¶1-2.)

8.     The complaint alleges that RED BULL is a California corporation with its principal place of business in Santa Monica, California. (Complaint, p. 2, ¶4.)

9.     The complaint further alleges that the subject experimental acrobatic aircraft crashed into plaintiff PHILIP AGNEW FARR and plaintiffs' decedent as a result of the pilot negligently engaging in acrobatic flying practice prior to an air show organized by the Aeroclub of Guatemala that was to take place on January 25, 2020 in Iztapa, Guatemala. (Complaint, ¶¶16-24.)

10.     Plaintiffs' central allegation of negligence against defendant are that pilot Andelin was negligent in his piloting his aircraft based on, among other things, performing improper acrobatic maneuvers at low altitude, directly over the club and spectators, in an area where he should not have been performing. (Complaint, p. 11, ¶42.) Furthermore, plaintiffs' central allegations include that "Team Chambliss," which was conducting the flight, was negligent in properly organizing the acrobatic flying performed by pilot Andelin, failing to properly instruct and supervise pilot Andelin as to how, when and where to safely perform acrobatic maneuvers. (Complaint, p. 13, ¶50.)

### III.    BASIS FOR REMOVAL

### A.    Federal Question

11.     Removal of this action is proper because 28 U.S.C. section 1331 authorizes removal on the ground of federal question. "The district court shall have original jurisdiction of all civil actions arising under the Constitution, laws, or *treaties* of the United States." (28 U.S.C §1331 (italics added).) Under 28 U.S.C. section 1331, an action "arises under" federal law if federal law creates the cause of action and/or grants federal jurisdiction to hear the case, *or plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law.* (*Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.* 545 U.S. 308, 314 (2005) (emphasis added).) Plaintiffs' right to relief in this matter necessarily depends on the resolution of a substantial question of federal law namely: (1) the Chicago Convention On International Civil Aviation of 1944 ("Chicago Convention"), an aviation treaty; (2) aviation regulations issued pursuant to the Chicago Convention

by the Guatemalan government; and (3) an act of state in the form of a Certificate of Waiver issued by the Guatemalan government specific to the flight at issue and the air show, which allowed deviations from and modifications to Guatemala's aviation regulations.

12.     A claim generally arises under federal law only when the "federal question is presented on the face of the plaintiff's properly pleaded complaint." (*Valles v. Ivy Hill Corp.* 410 F.3d 1071, 1075 (9th Cir. 2005).) However, "[f]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." (*Gunn v. Minton*, 568 U.S. 251, 133 S.Ct. 1059, 1065 (2013) ("*Gunn*").) The complaint's lack of reference to federal law is not controlling.  As long as the basis for the federal issue is set forth, federal question jurisdiction attaches. (*North American Phillips Corp. v. Emery Air Freight Corp.* 579 F.2d 229, 233-234 (2nd Cir. 1978).)

13.     The United States and Guatemala are both signatories to the Chicago Convention. The Chicago Convention is a treaty that applies specifically to air travel. (*Board of County Comm'rs v. Aerolineas Peruanasa, S.A.* 307 F.2d 802, 803 (5th Cir. 1962); *Nat'l. Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.* 357 F.3d 1319, 1331, n. 11 (Fed. Cir. 2004).)

14.     Article 12, Rules of the Air, of the Chicago Convention provides, in pertinent part, as follows:

> "Each contracting State undertakes to adopt measures to insure that every aircraft flying over or maneuvering within its territory and that every aircraft carrying its nationality mark, wherever such aircraft may be, shall comply with the rules and regulations relating to the flight and maneuver of aircraft there in force.  Each contracting State undertakes to keep its own regulations in these respects uniform, to the

4

greatest possible extent, with those established from time to time under this Convention.  Over the high seas, the rules in force shall be those established under this Convention.  Each contracting State undertakes to insure the prosecution of all persons violating the regulations applicable."

15.     Annex 2 of the Chicago Convention defines "acrobatic flight" as maneuvers "intentionally performed by an aircraft involving an abrupt change in its attitude, abnormal attitude, or an abnormal variation in speed." (Chicago Convention, Annex 2, Ch. 1.)  Annex 2 also provides that acrobatic flight is strictly prohibited, unless flown "under conditions prescribed by the appropriate authority and as indicated by relevant information, advice and/or clearance from the appropriate air traffic services unit." (Chicago Convention, Annex 2, Ch. 3, sec. 3.1.7.)  Aircraft are also not permitted to fly in prohibited or restricted areas unless "in accordance with the conditions of the restrictions or by permission of the State over whose territory the areas are established." (Chicago Convention, Annex 2, Ch. 3, sec. 3.1.10.)  "The pilot-in-command shall comply with the laws, regulations and procedures of those States in which operations are conducted." (Chicago Convention, Annex 6, Ch. 2, sec. 2.1.1.1.)

16.     In accordance with the Chicago Convention, the United States, pursuant to the Federal Aviation Act, has issued comprehensive Federal Aviation Regulations ("FARs") through the Federal Aviation Administration ("FAA").  The Federal Aviation Act (codified at 49 U.S.C. §§40101-49105) and the FARs preempt territorial standards of care for aviation safety.  Thus, with respect to air safety, the standard of care applicable to causes of action arising out of aviation accidents in the United States is the standard of care set forth in the FARs.  (See *Abdullah v. American Airlines, Inc.* 181 F.3d 363, 364-365 (3rd Cir. 1999).)  Due to the FAA's establishment of complete and thorough safety standards in its regulations, there is

an overarching general standard of care set forth by those regulations with respect to aviation accident cases. (*Id.* at 365.) The Court of Appeal in *Abdullah* indicated that the standard arises in general from 14 CFR section 91.13(a), which provides "no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." (*Abdullah, supra,* 181 F.3d at 365.) When other FARs provide more specific standards of care to more specific aviation operations, they will apply. (*Id.* at 371.)

17.     Pursuant to the Chicago Convention, Guatemala's General Directorate of Civil Aeronautics ("DGCA") also promulgated aviation regulations governing all aviation activities within Guatemala territory. These regulations cover, among other things, acrobatic flight, air shows, and the operation of experimental certificated aircraft in Guatemala. Those regulations are known as "Regulaciones de Aviacion Civil" ("RAC"). Like the FARs in the United States, the RACs set forth the standards of care for aviation safety in Guatemala.

18.     RAC 02.143 - Limitations of flight in the proximity of air space where special aeronautical events are developing, provides as follows:

> "No person can operate an aircraft over or in the vicinity of an area of airspace that has been designated to hold a special aeronautical activity, such as: launching parachute jumpers, formation flights or air shows/spectacles in general."

RAC 02.303 - Acrobatic flight, provides as follows:

> "No person may operate an aircraft in acrobatic flight:
> (a) Over any congested area of a city, town, or settlement;
> (b) Over an open air assembly of persons;
> (c) Within the lateral boundaries of the surface areas of an airspace designated for an airport;
> (d) Within 7,400 meters (4 nautical miles) from the center

1            line of established airways;

2            (e) Below an altitude of 450 meters (1,500 feet) above the

3            surface; or

4            (f) When flight visibility is less than 5 kilometers (3 statute

5            miles)."

6      For the purposes of this section, an acrobatic flight is referred to as an

7 intentional maneuver involving abrupt change in the aircraft's attitude, an abnormal

8 attitude, or abnormal acceleration, not applicable and/or unnecessary in a normal

9 flight.

10      RAC 02.319 - Aircraft with Experimental Certification: Limitations of

11 Operation, provides as follows:

12           "(a)   No person may operate an airplane that has

13                experimental certification:

14           (1)   For any purpose other than that for which the

15                certificate was issued, or

16           (2)   To transport people or items for remuneration or rent.

17           (b)   No person may operate an airplane that has

18                experimental certification outside of the area

19                assigned by the DGAC until it demonstrates that:

20           (1)   The airplane is controllable throughout its entire

21                normal speed range and through all the maneuvers to

22                be executed, and

23           (2)   The aircraft does not possess dangerous operating

24                characteristics or design.

25           (c)   Unless otherwise authorized by the DGAC for

26                special operation limitations, no person may operate

27                an experimental aircraft over areas of dense

28                population, or in a congested airway. The DGAC

may issue special limitations of operations for any aircraft in particular that permit it to take off and land on a densely populated area or a congested airway in accordance with the terms and conditions specified in the authorization in the interest of safety.

(d) Every person operating an experimental aircraft must:

(1) Warn all transported persons [passengers] of the experimental nature of the aircraft.

(2) Operate under VFR only during the day unless it has specific authorization otherwise by the DGAC, and

(3) Notify the control tower of the experimental nature of the aircraft when operating that aircraft into or out of airports with control tower services.

(e) The DGAC may dictate addition limitations that it considers necessary, including limitations on the people who may be transported by the aircraft."

19.    In this case, a Certificate of Waiver was issued by Guatemala's DGAC to the Aeroclub of Guatemala, which was organizing and presenting the Iztapa Air Show.  The Certificate was specifically issued to Aeroclub of Guatemala by the DGAC in accordance with the Chicago Convention and the RACs of Guatemala. The Certificate of Waiver modified the Guatemalan RACs and granted permission and set forth conditions for the air show activities, acrobatic flight maneuvers, and crowd attendance pertinent to the flight at issue.  Because it modified the RACs, its provisions set forth and inform the standards of care applicable to plaintiffs' action herein.

/ / /

## B.   Act Of State Doctrine

20.   Certain claims that do not "arise under" a federal statute or a provision of the Constitution may fall within federal question jurisdiction as "arising under" federal common law. (*Nat'l Farmers Union Ins. v. Crow Indian Tribe* 471 U.S. 845, 851-852 (1985); *Illinois v. City of Milwaukee, Wis.* 406 U.S. 91, 100 (1972).)  Suits involving international law "arise under" federal common law.

21.   Official acts of a foreign sovereign within its own borders receive deference in domestic courts under the act of state doctrine. (*Zivotofsky v. Kerry* 576 U.S. 1, 11 (2015).)  Where a causal chain between a defendant's purported act and plaintiff's injury cannot be determined without investigating motives of a foreign government, the act of state doctrine is implicated. (*O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A.* 830 F.2d 449, 453 (2nd Cir. 1987) (*"O.N.E."*); accord, *McElderry v. Cathay Pacific Airways, Ltd.* 678 F.Supp.1071, 1080 (S.D.N.Y. 1988), citing *O.N.E.*)

22.   The act of state doctrine serves as a basis for federal question jurisdiction when "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of foreign sovereign performed within its own territory." (*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l* 493 U.S. 400, 405 (1990); *Provincial Gov't Marinduque v. Placer Dome, Inc.* 582 F.3d 1083, 1092 (9th Cir. 2009).)

23.   Federal courts routinely find that the issuance of a permit, such as the Certificate of Waiver issued by Guatemala's DGAC, is a governmental function, which triggers the act of state doctrine. (See *Dominican Republic v. AES Corp.* 466 F.Supp.2d 680, 695 (E.D. VA 2006) (governmental issuance of permit generally triggers act of state doctrine); *Advanfort Co. v. Cartner* 2015 U.S. Dist. LEXIS, 199411 at *19-20 (ED VA. 2015) (*"Advanfort"*) (Republic of Marshall Islands' denial of permit was an act of state); *Breeze Salt, Inc. v. Mitsubishi Corp.* 899 F.3d 1064, 1070 (9th Cir. 2018) (issuance of license pertaining to country's natural resources is

1    an act of state); *Malewicz v. City of Amsterdam* 517 F.Supp.2d 322, 338 (D. DC
2    2007) (government's issuance of an export license was an act of state); and *Advanfort*
3    *Co. v. Int'l Registries, Inc.* 2015 US Dist. LEXIS 90912, at \*19 (ED. VA 2015)
4    (Brazil's decision to deny license implicated act of state doctrine.).)

5         24.    In *Advanfort*, defendant International Registries, Inc. ("IRI") moved to
6    dismiss two counts of plaintiffs' second amended complaint based on the act of state
7    doctrine arising out of the Republic of the Marshall Islands' suspension of a security
8    services permit. In its analysis, the *Advanfort* court identified the two elements which
9    support invoking the act of state doctrine: (1) a public act by a foreign state; and (2)
10   the act occurring within the sovereign foreign state's territory. (*Advanfort, supra,*
11   2015 U.S. Dist. LEXIS 199411, at \*16.) The court also noted that the doctrine was
12   not inflexible and could still be applied even if all elements were not satisfied. (*Id.*)
13   The Marshall Islands' decision to suspend a permit was determined to be a public act
14   of state. (*Id.*) The plaintiffs argued that the doctrine was inapplicable because it was
15   IRI's conduct that was allegedly at issue, not the conduct of the Marshall Islands.
16   This argument lacked merit because the Marshall Islands was the authority that
17   rejected the permit and because plaintiff did not demonstrate that IRI acted on its own
18   in the matters at issue. (*Id.* at \*17-18.) The rejection of the permit was further found
19   to be a public act since it was central to an issue in the case, not merely incidental.
20   (*Id.* at \*18-20.)

21        25.    The Guatemala DGAC's issuance of the Certificate of Waiver was a
22   public act of state. The DGAC was created pursuant to Guatemalan Legislative
23   Decree No. 1032. It is a Guatemalan governmental agency and its decision regarding
24   the issuance of or denial of permits, such as Certificates of Waiver, are public acts
25   which involve the regulation of aviation in Guatemala.  In order to participate in air
26   show activities in Guatemala, the air show organizer is required to obtain permits
27   from the DGAC, such as a Certificate of Waiver, since acrobatic flight is generally
28   prohibited (pursuant to the Chicago Convention and the RACs). Highly relevant and

NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. SECTION 1331

central to plaintiffs' lawsuit is the fact that the flight and air show at issue could *not* have taken place in Guatemala *but for* the DGAC's issuance of the Certificate of Waiver. Moreover, the Certificate of Waiver contains requirements and permissions for certain types of flight, and when and where such flights could be conducted in connection with the subject air show, among other things. In other words, the pilot and the air show were governed by the requirements and permissions of the Certificate of Waiver issued by the Guatemalan DGAC specific to subject air show and subject flight. In that regard, the Certificate of Waiver is central to plaintiffs' complaint because it sets forth the standard of care and informs the duty of care applicable to plaintiffs' causes of action. The territorial requirement is also satisfied. The DGAC's decision to issue the Certificate of Waiver had its effect within Guatemala's territory and the flight at issue took place there.

26.   Case law in an analogous setting also holds that a federal license can be the basis of the standard of care for purposes of establishing federal question jurisdiction. (*Carrington v. City of Tacoma, Dep't of Pub. Utilities, Light Div.,* 276 F.Supp.3d 1035, 1039 (W.D. Wash. 2017) ("*Carrington*").) In *Carrington,* the plaintiffs attempted to sue defendant Tacoma Public Utilities ("TPU"), alleging state court claims for damages resulting from TPU's flow regimen for the Skokomish River. However, defendant TPU was operating pursuant to the requirements of a federal license issued by the Federal Energy Regulatory Commission ("FERC"). Defendant TPU removed the case to federal court and argued that plaintiffs' state law causes of action necessarily raised two federal questions: (1) whether TPU breached the duty of care established by its federal license and (2) whether §10(c) of the Federal Power Act preserved all state law damage claims. Plaintiffs sought remand and contended that the duty of care arises from state law not TPU's federal license issued by FERC. The United States District Court held that because plaintiffs' state law negligence claim necessarily raises a substantial federal question regarding the duty of care established by TPU's FERC license, plaintiffs' motion to remand for lack

1   of federal question jurisdiction lacked merit. (*Carrington, supra*, 276 F.Supp.3d at
2   1042.)

3        27.    A state law claim "necessarily raises" a federal question when the court
4   must apply federal law to the facts of the plaintiffs' case. (*Gunn, supra*, 568 U.S. 251,
5   133 S.Ct. at 1065.) In this case, plaintiffs' suit arises under federal law and the act
6   of state doctrine and because suits involving international law arise under federal
7   common law. The *Carrington* court held that the plaintiffs' negligence claim
8   necessarily raises a federal question because defendant TPU's FERC license
9   establishes the applicable duty of care. Similarly, in the present matter, plaintiffs'
10  claims necessarily raise a federal question because Guatemala's DGAC issued a
11  Certificate of Waiver - an act of state - which allowed for deviation from and
12  modification of Guatemala's RACs. The deviations and modifications created by the
13  act of state allowed the flight and air show at issue to transpire, including, but not
14  limited to, the type and manner of acrobatic flight being conducted, its location, and
15  the presence and location of an open air assembly of persons in the vicinity of the
16  specially permitted flight operations, as well as the operation of experimental aircraft
17  during the air show activity. Without the Certificate of Waiver, Guatemala's RACs
18  would have set forth and informed the standard of care. However, in this case, the
19  Certificate of Waiver issued by the government of Guatemala, just like the FERC
20  license in *Carrington*, sets forth the duty of care directly applicable to the flight at
21  issue because that flight and activities surrounding it, such as the air show and the
22  assembly of persons, could not have taken place *but for* the express permission and
23  conditions set forth in the Certificate of Waiver.

24       28.    Plaintiffs' claims in this action involve federal question act of state
25  issues which are substantial. Whether a federal issue is substantial is determined by
26  "the importance of the issue to federal system as a whole." (*Gunn, supra*, 568 U.S.
27  251, 133 S.Ct. at 1066.) In *Carrington*, the District Court determined that because
28  it was necessary to interpret the defendant's FERC license to determine the duty of

1    care, the plaintiffs' claims implicated a substantial issue of federal law. (*Carrington,*
2    *supra,* 276 F.Supp.3d at 1042.)  Similarly, in the present matter, it is necessary to
3    interpret the Guatemala DGAC's RACs and its specific Certificate of Waiver issued
4    in this case in order to determine the duty of care at the time of the flight at issue,
5    including presence of plaintiffs and plaintiffs' decedent.  The duty and standard of
6    care applicable to this case depends on the RACs and the Certificate of Waiver.  Like
7    the FERC in *Carrington,* and the FAA and its FARs as described in *Abdullah,*
8    Guatemala's DGAC provides a comprehensive regulatory structure for aviation
9    activities in Guatemala.  Furthermore, DGAC's Certificate of Waiver regarding the
10    specific activities relevant to the air show, and the subject flight involve an act of
11    state specifically applicable to the flight at issue above and beyond the body of RACs
12    generally applicable to all aviation activities throughout Guatemala.

13       29.    There is no indication that the present matter is not capable of resolution
14    in federal court without disrupting the federal-state balance approved by Congress.
15    In fact, because it directly involves an act of state by the DGAC over matters that it
16    has authority to govern within the state of Guatemala, it is appropriate to resolve this
17    dispute in a federal forum.  This case is set apart as comparatively rare by its
18    international setting and the involvement of an act of state of a foreign government
19    in foreign territory.  Accordingly, the number of cases that are subject to federal
20    jurisdiction under these circumstances would not significantly shift state law claims
21    from state courts to federal courts.

22            **C.**     **The Venue Is Proper**

23       30.    This is the proper district for removal, pursuant to 28 U.S.C. section
24    1441(a), in that the Central District of California includes the County of Los Angeles,
25    and is "the district and division embracing the place where such action is pending."

26            **D.**     **Pleadings in the State Court Action**

27       31.    A copy of this Notice of Removal is being filed with the clerk of the
28    court for the Superior Court for the State of California for the County of Los Angeles,

1 | and is being served upon plaintiffs and all parties of record, pursuant to 28 U.S.C.
2 | section 1446(d).

3 | **E.    Joinder of All Defendants**

4 | 32.    The removing defendant is the only named defendant. Accordingly, all
5 | named defendants have joined in this removal.

6 | **F.    No Related Case is Pending**

7 | 33.    To the best of defendant's knowledge, there are no cases presently
8 | pending in this Court that relate to the action that is the subject of this notice of
9 | removal.

10 | **IV.    CONCLUSION**

11 | For the foregoing reasons, this action is removable to the United States District
12 | Court for the Central District of California.

13 |

14 | DATED: May 13, 2021                MICHAELIS, MONTANARI & JOHNSON

15 |

16 | By: _____
17 | GARRY L. MONTANARI
     Attorneys for Defendant
18 | RED BULL NORTH AMERICA, INC.

19 | N:\21505\pld\p-nt.removal.fed.court.wpd

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

14

# EXHIBIT A

21STCV12165

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Serena Murillo

Electronically FILED by Superior Court of California, County of Los Angeles on 03/30/2021 02:18 PM Sherri R. Carter, Executive Officer/Clerk of Court, by H. Flores-Hernandez,Deputy Clerk

1  Robins Kaplan LLP
   Roman M. Silberfeld, Bar No. 62783
2  RSilberfeld@RobinsKaplan.com
   Zac Cohen, Bar No. 316547
3  ZCohen@RobinsKaplan.com
   2049 Century Park East, Suite 3400
4  Los Angeles, California 90067-3208
   Telephone:     310 552 0130
5  Facsimile:     310 229 5800

6  *Attorneys for Plaintiffs*
   *Nelson Daniel Farr Bunker, et al.*
7

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                       **COUNTY OF LOS ANGELES**

10

11  NELSON DANIEL FARR BUNKER,            Case No.    **21STCV12165**
    individually and as the personal representative
12  of the ESTATE OF MARIA JOHANNA        **COMPLAINT FOR:**
    PASSARELLI SCHLESINGER, and as the
13  parent and legal guardian of PHILIP AGNEW   **1. Negligence (Wrongful Death and**
    FARR, their minor son, and NELSON     **Survivor Action)**
14  DANIEL FARR,
                                          **2. Negligence (Personal Injury Action)**
15              Plaintiffs,
                                          **DEMAND FOR JURY TRIAL**
16       v.

17  RED BULL NORTH AMERICA, INC.,

18              Defendant.

19

20       Plaintiff Nelson Daniel Farr Bunker, individually and as the Personal Representative of the

21  Estate of his deceased wife Maria Johanna Passarelli Schlesinger, and as the parent and legal

22  guardian of Philip Agnew Farr, their minor son, and Plaintiff Nelson Daniel Farr, sue Defendant

23  Red Bull North America, Inc., and allege the following:

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61771011.1                                                          COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1     **PARTIES, JURISDICTION AND VENUE**

2     1.     Nelson Daniel Farr Bunker ("Nelson"), is a dual citizen of the United States and

3 Guatemala, and resides in California. His address is 525 Willard Dr., Apt. 1912, Folsom, California

4 95630. Nelson is *sui juris*. Nelson brings this suit (1) individually, (2) as the personal representative

5 of the estate of his deceased wife Maria Johanna Passarelli Schlesinger, and (3) as the parent and

6 legal guardian of Philip Agnew Farr Passarelli, their minor son. Philip is also a dual citizen of the

7 United States and Guatemala, and resides in California. His address is the same as his father's.

8 Philip brings this action through Nelson, his natural father and legal guardian.

9     2.     Nelson Daniel Farr ("Daniel"), is a dual citizen of the United States and Guatemala,

10 and also resides at 525 Willard Dr., Apt. 1912, Folsom, California 95630. Before the accident

11 giving rise to this lawsuit, Daniel lived at 543 Mission De Oro Dr., Redding, California 96003.

12 Daniel has lived in California for several years now. Daniel is Nelson and Maria Johanna's 21 year-

13 old son, and Philip's older brother. Daniel is *sui juris*.

14     3.     Nelson, Philip, and Daniel are collectively, the "Plaintiffs."

15     4.     Defendant Red Bull North America, Inc. is a California corporation with its

16 principal place of business in Santa Monica, CA.

17     5.     Personal jurisdiction exists over Red Bull in California because Red Bull is a

18 California corporation and conducts regular and substantial business there. Also, Plaintiffs' claims

19 arise from the business Red Bull conducts in California.

20     6.     Venue is proper in the Superior Court of Los Angeles because Red Bull is

21 headquartered in Los Angeles County, and a substantial portion of the events giving rise to this

22 lawsuit took place in Los Angeles County.

23     **FACTUAL BACKGROUND**

24     **Red Bull And "Team Chambliss"**

25     7.     In what began as an energy drink company, Red Bull has turned into a global brand

26 that now regularly sponsors spectacular stunts and extreme sporting events. Red Bull's slogan "Red

27 Bull gives you wings" is about pushing all boundaries to accomplish what seems impossible to

28 most.

- 2 -

8.     Red Bull built its brand by sponsoring extreme sports like air racing, aerobatic flying, downhill mountain bike racing, base jumping, high diving, and cliff diving, just to name a few. The company spends more on sponsorships and marketing than it spends making the famous Red Bull energy drink. For example, Red Bull established the "Red Bull High Performance Center," a place where their athletes can train, in Santa Monica, California. Red Bull's marketing campaigns are wildly successful and have led to enormous profits for the company. The marketing and sponsorship strategy is run mostly from its California offices.

9.     Kirby Chambliss is an aerobatic pilot and Red Bull athlete. He was recruited to Red Bull through its California operation. He leads "Team Chambliss," a group of aerobatic pilots. Red Bull sponsors the whole team and has for years. In fact, Red Bull and Mr. Chambliss contracted through Chambliss Aerobatics, LLC—a company Mr. Chambliss owns and controls—for the multi-industry giant to sponsor Team Chambliss. From its California operation, Red Bull orchestrated the meetings and sponsorship negotiations between the parties. Mr. Chambliss also owns and controls the company KNC 2, LLC.

10.    Mr. Chambliss either individually, or through Chambliss Aerobatics, LLC, contracted with another aerobatic pilot, Steven Andelin, to fly as part of Team Chambliss. Mr. Andelin is based in California and has worked with Team Chambliss since at least as early as October 2018.

11.    Red Bull officially discontinued its "Red Bull Air Races" at the end of the 2019 season, but the company continued sponsoring Mr. Chambliss, "Team Chambliss," and Chambliss Aerobatics, LLC for air shows in 2020. During a January 7, 2020 podcast, Mr. Chambliss stated "I'm still sponsored by Red Bull North America," and "Red Bull gives me wings." Mr. Chambliss also stated that he had approximately 20 air shows already scheduled for the year.

12.    The Red Bull website still shows videos and pictures of Mr. Chambliss in a Red Bull uniform, flying Red Bull branded aircraft, and at numerous Red Bull sponsored events. Mr. Chambliss is still pictured and listed on Red Bull's website as being part of the "Pilots and Members of the Race Committee."

- 3 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

13. Likewise, the "Team Chambliss" website continues to prominently display the Red Bull logo scattered across the webpage.

14. Prominent industry groups such as the International Council of Air Shows ("ICAS") also continue to date to reflect listings for "Kirby Chambliss Aerobatics (Red Bull)" at multiple air shows in 2021.

15. As a member organization of ICAS, if Red Bull did not approve of these listings on the ICAS website or thought they were worded inaccurately, Red Bull could have immediately caused these listings to be rectified, but these continue to be the listings to date.

**The Air Show Tragedy In Iztapa**

16. On January 25, 2020, Team Chambliss was scheduled to perform at "Air Show Iztapa" in Iztapa, Guatemala.

17. The advertisements for the air show demonstrate that all of Team Chambliss—including Mr. Chambliss and Mr. Andelin—was sponsored by Red Bull:

- 4 -

61771011.1



18.     Mr. Chambliss's company KNC 2, LLC, owned the aircraft that Team Chambliss planned to fly at the air show. Those aircraft were flown to Guatemala from the United States. In particular, Mr. Chambliss instructed Mr. Andelin to fly one of the aircraft, the N540ZA, from the United States to Guatemala.

19.     On January 24, 2020, the day before the air show, Team Chambliss participated in a practice session. Guests and members of the "Aero Club" that was hosting the air show were invited to attend the session.

- 5 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

20.     Nelson, Philip, Maria Johanna, and Maria's mother, Maria Luisa Schlesinger Sempe, attended the practice session on January 24. Philip, who is a huge fan of flying, was given a "Red Bull Team Chambliss" hat by Mr. Chambliss himself. Philip hoped to get all of the pilots' autographs by the end of the day.

21.     The practice session commenced. During the session, at approximately 5:30 p.m., Nelson moved a short distance away from his family to take pictures. Philip, his mother Maria Johanna, and his grandmother Maria Luisa stood together watching the practice session well within a "safe zone" of the show.

22.     At that moment, the N540ZA Aircraft (the "Aircraft"), piloted by Mr. Andelin, tragically crashed into the ground. The crash killed Philip's mother Maria Johanna, his grandmother Maria Luisa, and catastrophically injured Philip. The horrific scene was caught on video.

23.     At all relevant times, the Aircraft was owned by KNC 2, LLC, operated by Chambliss Aerobatics, LLC as part of its "Team Chambliss" operations, sponsored by Red Bull, and piloted by Steven Andelin.

24.     Just before the crash, Mr. Andelin was performing improper and unsafe aerobatic flying maneuvers at a low altitude, directly over congested areas including the club and spectators, where he should not have been performing.

25.     Upon hearing and seeing the commotion, Nelson raced back the short distance to his family, only to come upon the partially dismembered bodies of his wife and mother-in-law on the ground, and his son Philip spurting blood from a deep cut in his right thigh. Philip's right arm was shredded and burned.

26.     Philip suffered a multitude of gruesome injuries. For example, the radial nerve in Philip's right arm was completely severed. As a result, Philip has permanently lost all functions associated with that nerve. Further, the median nerve in the right arm was stretched or stunted, and if the functions of the median nerve cannot be recovered, amputation of the right arm may be necessary. Philip also suffered numerous bone fractures in his right arm, and suffered a deep cut to the femoral artery in his right thigh which also resulted in nerve damage.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61771011.1

COMPLAINT

27.     After the crash, Philip and Nelson were airlifted to a hospital in Guatemala City where Philip underwent emergency surgery. According to the initial medical reports, Philip's right arm showed a 12 by 8 centimeter grossly contaminated transverse wound on the proximal third of the forearm with multiple disrupted muscles and tendons. X-rays of Philip's elbow showed dislocation associated to an epicondyle fracture of the distal humerus, proximal third fracture of ulna and radius bones with approximately 5 centimeters of diaphysial bone-loss on the radius bone. Philip's radial nerve was severed, and his median nerve was also damaged. The proximal third of Philip's right medial thigh also had an 8 by 8 centimeter grossly contaminated wound which required vascular repair. Because of the gravity of Philip's injuries, he was placed in the pediatric intensive care unit. During his stay at this hospital, Philip required multiple debridement procedures as well as several blood transfusions. Because of the gravity of Philip's injuries, medical professionals advised Philip to seek further care at the Hospital for Special Surgery ("HSS") in New York.

28.     On January 30, 2020, Philip and Nelson were airlifted to New York, where Philip was admitted to the pediatric intensive care unit at New York Presbyterian Hospital ("NYP"). The next day, orthopedic doctors from NYP and HSS took Philip in for a debridement procedure and to evaluate his injuries. The doctors determined that Philip's bone fractures needed to be addressed first.

29.     On February 3, 2020, Philip underwent a 2.5 hour surgery at NYP, where doctors realigned the bones and replaced the hardware in his right arm. Then on February 5, 2020, Philip underwent a 4 hours surgery, during which the doctors performed another debridement, replaced hardware, and stabilized Philip's elbow. The next day, Philip was transferred to HSS. On February 7, 2020 doctors performed another cleaning and debridement. A few days later, on February 10, 2020, the doctors again performed cleaning and debridement, but also determined that Philip required a flap surgery to replace the muscle and tissue that he lost. On February 12, 2020, doctors performed the flap surgery. The doctors removed muscle and tissue from Philip's left thigh and placed it on his right forearm. That surgery lasted over 12 hours, but was unsuccessful because of the immense damage to Philip's right arm. After his flap surgery, Philip stayed in the intensive care

- 7 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   unit and received several more blood transfusions. Because the flap surgery failed, doctors

2   considered the possibility of having to amputate Philip's right arm to preserve any semblance of

3   functionality in his limb. On February 14, 2020 the doctors performed a 4 hour surgery to try and

4   clear out blood clots that had formed. Afterwards, Philip returned to the intensive care unit for close

5   monitoring. On February 24, 2020, doctors closed the wound on Philip's left thigh from the flap

6   surgery. During the same procedure, the doctors placed a synthetic material over the wound on

7   Philip's right arm in order to prevent infection. On February 26, 2020, doctors began initial testing

8   of prosthetic options for Philip's right hand. On February 27, 2020, Philip started daily sessions

9   with an occupational therapist; his goal was to gain enough strength in his right arm so that doctors

10  could amputate it below the elbow.

11       30.    On March 2, 2020, doctors took a CT scan of Philip's arms, and performed a

12  dressing change on Philip's right arm. The next day, Philip was finally discharged from the hospital.

13  At the end of the month, on March 27, 2020, after several in-person and video tele-heath therapy

14  sessions, Philip returned to the operating room as an out-patient for a cleaning and debridement

15  procedure, as well as a replacement of the protective synthetic material used on his wounds. At this

16  stage, there was a significant clinical improvement in Philip's right arm, and doctors began to regain

17  hope that the arm could be saved. Philip continued to work very hard in his physical therapy

18  sessions and to regain strength.

19       31.    After thorough evaluations, the doctors at HSS recommended that a team of doctors

20  at the University of California San Francisco ("UCSF") specializing in nerve repair take over

21  Philip's care. A move to California also made sense for Philip because his older brother Daniel was

22  living there. In June 2020, Philip and Nelson left to California. On July 16, 2020, Philip had his

23  first appointment at The Peripheral Nerve Center at UCSF. The doctors there recommended another

24  flap surgery. Meanwhile, Philip continued with physical and occupational therapy at a center in

25  Sacramento, California.

26       32.    On October 29, 2020, Philip underwent surgery at UCSF. The doctors performed

27  various procedures simultaneously. The orthopedic team harvested a bone graft from Philip's hip

28  to replace the 5 centimeter gap in his arm that existed due to bone-loss when his arm initially

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

617710111.1

1    fractured. The doctors also removed some hardware from Philip's elbow because of the physical

2    pain it caused him. The doctors also performed the flap surgery. To complete the flap and

3    reconstructive surgery, the doctors first harvested muscle from Philip's latissimus and placed it on

4    his forearm. The doctors next harvested skin from Philip's leg to cover the muscle placed on his

5    arm. The doctors then used Philip's severed radial nerve to innervate the muscle placed in his arm,

6    all to diminish the physical pain that he endures because of it. The operation lasted 10 hours and

7    Philip was again placed in the ICU and held under close observation. Philip was in the hospital for

8    10 days following this surgery.

9        33.    Philip's injuries, all a result of the crash, have forever changed his life, and the lives

10   of his father Nelson and older brother Daniel.

11       34.    When "Team Chambliss" and its pilots were flying during the practice session,

12   Nelson, Philip, Maria Johanna, and her mom Maria Luisa all believed that they were safe. They

13   believed that they were safe because the air show and the practice session were Red Bull events

14   with Red Bull branded aircraft. They trusted that Team Chambliss and Mr. Andelin would fly the

15   Red Bull branded aircraft safely. They, under no circumstance, thought that Red Bull would put

16   their lives in danger.

17       35.    The very next week Red Bull sponsored Mr. Chambliss at another air show. That

18   next air show was supposed to have also featured Mr. Andelin. The advertisements for that next air

19   show demonstrate that both Mr. Chambliss and Mr. Andelin were, once again, flying for Red Bull.

20       36.    That next show took place just a week later, on February 1 and 2, 2020:

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES



   

## COUNT I - NEGLIGENCE

### (Wrongful Death and Survival Action)

37.    Plaintiffs incorporate by reference paragraphs 1 through 36 as though fully alleged here.

- 10 -

1    38.    Red Bull is vicariously liable for Mr. Andelin's failure to use ordinary care in

2    piloting the Aircraft, and vicariously liable for Mr. Chambliss's and Chambliss Aerobatics, LLC's

3    failure to use ordinary care in conducting the Iztapa air show practice session.

4                              **Steven Andelin's Negligence**

5    39.    Red Bull by and through its agents, actual, apparent and ostensible, including Mr.

6    Andelin, had a duty to use that degree of care that an ordinarily careful and prudent company would

7    use under the same or similar circumstances.

8    40.    The California Civil Code provides that an agency is ostensible when the "principal

9    intentionally, or by want of ordinary care, causes a third person to believe another to be his agent

10   who is not really employed by him." *See* Civ. Code § 2317.

11   41.    In this case, Mr. Andelin was either the actual, apparent or ostensible agent of Red

12   Bull. Any reasonably prudent person viewing, among other things, (1) the advertisements for the

13   Iztapa air show highlighting Mr. Andelin as part of "Red Bull Team Chambliss" and replete with

14   Red Bull branding and logos, (2) the Aircraft flown by Mr. Andelin at the practice session for the

15   air show covered in Red Bull branding and logos, (3) Mr. Andelin's uniform reflecting the Red Bull

16   branding and logo, and (4) the information available on-line, including on the Red Bull and Team

17   Chambliss websites, indicating Red Bull's sponsorship of "Team Chambliss" and Mr. Andelin's

18   prior participation at other air shows as part of "Team Chambliss," would reasonably conclude that

19   Mr. Andelin was an authorized agent of Red Bull. Indeed, Red Bull's own website assures

20   consumers that "anything carrying our trademark can be relied on." All of these advertisements and

21   other displays of the Red Bull branding and logos in conjunction with Mr. Andelin were part of

22   Red Bull's marketing campaign, all designed to bring more profits to Red Bull.

23   42.    Mr. Andelin had a duty to use that degree of care that an ordinarily careful and

24   prudent pilot would use under the same or similar circumstances. Mr. Andelin was negligent in his

25   piloting of the Aircraft based on, among other things, performing improper and unsafe aerobatic

26   maneuvers at a low altitude, directly over the club and spectators, in an area where he should not

27   have been performing.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61771011.1                                                              COMPLAINT

43.     Red Bull is vicariously liable for any and all actions of Mr. Andelin, including his negligent piloting of the Aircraft at the Iztapa air show practice session, by reason of its principal and agent relationship with Mr. Andelin.

44.     Maria Johanna was killed as a direct result of Mr. Andelin's negligent piloting of the Aircraft at the Iztapa air show practice session.

45.     Plaintiffs are entitled to damages for Maria Johanna's wrongful death, including but not limited to the pecuniary losses suffered by reason of the death, grief, sorrow, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, society, instruction, guidance, counsel, training, and support of which Plaintiffs have been deprived because of Maria Johanna's wrongful death, further including, loss of probable support, past and future lost income, household services, and other value of benefits which would have been provided by the deceased.

46.     Plaintiffs further claim damages for what Maria Johanna may have suffered between the time of the crash, her injury, and her ultimate death, and for the recovery of which Maria Johanna might have pursued had she not died. Those damages might include damages for injuries like mental anguish, physical disability, conscious pain and suffering, pre-impact terror, disfigurement, and more.

47.     Plaintiffs also claim punitive damages, which are appropriate in light of Mr. Andelin's extreme recklessness in piloting the Aircraft in total disregard of human life, and in light of the fact that it is Red Bull's corporate policy, through its officers, directors, and managing agents, to encourage extreme and recklessness behavior as a marketing strategy to increase sales of its product.

**Kirby Chambliss's and Chambliss Aerobatics, LLC's Negligence**

48.     In addition to the above, Plaintiffs allege that Red Bull, by and through its agents, actual, apparent and ostensible, including Mr. Chambliss and his company Chambliss Aerobatics, LLC which at all relevant times operated "Team Chambliss," had a duty to use that degree of care that an ordinarily careful and prudent company would use under the same or similar circumstances.

49.     Mr. Chambliss and Chambliss Aerobatics, LLC were either the actual, apparent or ostensible agents of Red Bull. Any reasonably prudent person viewing, among other things, (1) the

- 12 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1 advertisements for the Iztapa air show specifically highlighting Mr. Chambliss, "Red Bull Team

2 Chambliss," and replete with Red Bull branding and logos, (2) the Aircraft flown by Mr. Chambliss

3 at the practice session for the Iztapa air show covered in Red Bull branding and logos, (3) Mr.

4 Chambliss' uniform reflecting the Red Bull logo, and (4) the information available on-line,

5 including on the Red Bull and Team Chambliss websites, reflecting Red Bull's sponsorship of

6 "Team Chambliss," would reasonably conclude that Mr. Chambliss and Chambliss Aerobatics,

7 LLC were authorized agents of Red Bull. Indeed, Red Bull's own website assures consumers that

8 "anything carrying our trademark can be relied on." All of these advertisements and other displays

9 of the Red Bull branding and logos in conjunction with Mr. Chambliss and Chambliss Aerobatics,

10 LLC were part of Red Bull's marketing campaign designed to bring more profits to Red Bull.

11     50.     Mr. Chambliss and his entity Chambliss Aerobatics, LLC had a duty to use that

12 degree of care that an ordinarily careful and prudent organizer of a performance of aerobatic flying

13 would use under the same or similar circumstances. In this case, Mr. Chambliss either individually

14 or through his entity Chambliss Aerobatics, LLC contracted for Mr. Andelin to perform at the Air

15 Show as part of "Team Chambliss" and sponsored by Red Bull. Mr. Chambliss and Chambliss

16 Aerobatics, LLC were negligent in failing to properly organize the aerobatic flying performed by

17 Team Chambliss, and specifically Mr. Andelin, at the practice session for the Iztapa air show on

18 January 24, 2020, and in failing to properly instruct and supervise Mr. Andelin as to how, when,

19 and where to safely perform aerobatic maneuvers. Mr. Chambliss's and Chambliss Aerobatics,

20 LLC's negligence in failing to properly instruct and supervise Mr. Andelin occurred both before

21 the fatal flight, and while Mr. Andelin was in the air piloting the Aircraft and performing the

22 improper aerobatic maneuvers at the practice session on January 24, 2020.

23     51.     By reason of its principal and agent relationship with Mr. Chambliss and Chambliss

24 Aerobatics, LLC, Red Bull is vicariously liable for any and all actions and omissions of Mr.

25 Chambliss and Chambliss Aerobatics, LLC, including (1) their negligent and careless organizing

26 of the aerobatic flying at the practice session for the air show, (2) their failure to properly instruct

27 and supervise Mr. Andelin before the practice session for the air show, and (3) their negligent

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

1    failure to instruct and supervise Mr. Andelin while he was in the air piloting the Aircraft during the

2    practice session for the air show.

3        52.    Maria Johanna was killed as a direct result of Mr. Chambliss's and Chambliss

4    Aerobatics, LLC's negligence, for which Red Bull is vicariously liable.

5        53.    Plaintiffs further claim punitive damages which are appropriate in light of

6    Mr. Andelin's extreme recklessness in piloting the Aircraft in total disregard of human life as part

7    of Team Chambliss, which was operated at all relevant times by Chambliss Aerobatics, LLC.

8    Plaintiffs' claim for punitive damages is also based on Mr. Chambliss' complete failure to organize

9    the practice session and instruct Mr. Andelin as he flew for Team Chambliss, and in light of the

10   fact that it is Red Bull's corporate policy, through its officers, directors, and managing agents, to

11   encourage such extreme recklessness as a marketing strategy to increase sales of its product.

12       Wherefore, Plaintiffs pray for judgment against Red Bull as follows:

13       (A)    For general damages  suffered by Plaintiffs for loss of love, affection, care, society,

14   service, comfort, support, right to support, companionship, solace or moral support, expectations

15   of future support and counseling, other benefits and assistance of Maria Johanna according to proof;

16       (B)    For economic damages suffered by Plaintiffs related to the loss of earnings and loss

17   of financial support from Maria Johanna;

18       (C)    For economic damages suffered by Plaintiffs related to burial and funeral expenses

19   according to proof;

20       (D)    For prejudgment interest and post-judgment interest and costs;

21       (E)    For punitive damages in such sums as will serve to punish and deter Red Bull from

22   future wrongdoing; and

23       (F)    For such other and further relief as the court deems just and proper.

24

25                        **COUNT II – NEGLIGENCE**

26                          **(Personal Injury Action)**

27       54.    Plaintiffs incorporate by reference paragraphs 1 through 36 as though fully alleged

28   here.

- 14 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1      55.    Red Bull is vicariously liable for Mr. Andelin's failure to use ordinary care in

2  piloting the Aircraft, and for Mr. Chambliss' and Chambliss Aerobatics, LLC's failure to use

3  ordinary care in conducting the Iztapa air show practice session

4                              **Steven Andelin's Negligence**

5      56.    Red Bull by and through its agents, actual, apparent and ostensible, including Mr.

6  Andelin, had a duty to use that degree of care that an ordinarily careful and prudent company would

7  use under the same or similar circumstances.

8      57.    The California Civil Code provides that an agency is ostensible when the "principal

9  intentionally, or by want of ordinary care, causes a third person to believe another to be his agent

10  who is not really employed by him." *See* Civ. Code § 2317.

11      58.    In this case, Mr. Andelin was either the actual, apparent or ostensible agent of Red

12  Bull. Any reasonably prudent person viewing, among other things, (1) the advertisements for the

13  Iztapa air show highlighting Mr. Andelin as part of "Red Bull Team Chambliss" and replete with

14  Red Bull branding and logos, (2) the Aircraft flown by Mr. Andelin at the practice session for the

15  air show covered in Red Bull branding and logos, (3) Mr. Andelin's uniform reflecting the Red Bull

16  branding and logo, and (4) the information available on-line, including on the Red Bull and Team

17  Chambliss websites, indicating Red Bull's sponsorship of "Team Chambliss" and Mr. Andelin's

18  prior participation at other air shows as part of "Team Chambliss," would reasonably conclude that

19  Mr. Andelin was an authorized agent of Red Bull. Indeed, Red Bull's own website assures

20  consumers that "anything carrying our trademark can be relied on." All of these advertisements and

21  other displays of the Red Bull branding and logos in conjunction with Mr. Andelin were part of

22  Red Bull's marketing campaign, all designed to bring more profits to Red Bull.

23      59.    Mr. Andelin had a duty to use that degree of care that an ordinarily careful and

24  prudent pilot would use under the same or similar circumstances. Mr. Andelin was negligent in his

25  piloting of the Aircraft based on, among other things, performing improper and unsafe aerobatic

26  maneuvers at a low altitude, almost directly over the club and spectators, in an area where he should

27  not have been performing.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 15 -

COMPLAINT

60. Red Bull is vicariously liable for any and all actions of Mr. Andelin, including his negligent piloting of the Aircraft at the Iztapa air show practice session, by reason of its principal and agent relationship with Mr. Andelin.

61. Philip suffered grave bodily injuries as a direct result of the negligent conduct of Mr. Andelin, for which Red Bull is vicariously liable.

62. Not only has Philip suffered catastrophic and permanent physical injuries, but the emotional distress, suffering, anguish, fright, horror, nervousness, grief, anxiety, and worry he has suffered and continues to suffer, particularly after standing immediately next to his mother and grandmother at the moment they were partially dismembered and killed, is enormous.

63. Nelson and Philip also claim punitive damages which are appropriate in light of Mr. Andelin's extreme recklessness in piloting the Aircraft in total disregard of human life and in light of the fact that it is Red Bull's corporate policy, through its officers, directors, and managing agents, to encourage such extreme recklessness as a marketing strategy to increase sales of its product.

## Kirby Chambliss's and Chambliss Aerobatics, LLC's Negligence

64. In addition to the above, Plaintiffs allege that Red Bull, by and through its agents, actual, apparent and ostensible, including Mr. Chambliss and his company Chambliss Aerobatics, LLC which at all relevant times operated "Team Chambliss," had a duty to use that degree of care that an ordinarily careful and prudent company would use under the same or similar circumstances.

65. Mr. Chambliss and Chambliss Aerobatics, LLC were either the actual, apparent or ostensible agents of Red Bull. Any reasonably prudent person viewing, among other things, (1) the advertisements for the Iztapa air show specifically highlighting Mr. Chambliss, "Red Bull Team Chambliss," and replete with Red Bull branding and logos, (2) the Aircraft flown by Mr. Chambliss at the practice session for the Iztapa air show covered in Red Bull branding and logos, (3) Mr. Chambliss' uniform reflecting the Red Bull logo, and (4) the information available on-line, including on the Red Bull and Team Chambliss websites, reflecting Red Bull's sponsorship of "Team Chambliss," would reasonably conclude that Mr. Chambliss and Chambliss Aerobatics, LLC were authorized agents of Red Bull. Indeed, Red Bull's own website assures consumers that "anything carrying our trademark can be relied on." All of these advertisements and other displays

- 16 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

1    of the Red Bull branding and logos in conjunction with Mr. Chambliss and Chambliss Aerobatics,
2    LLC were part of Red Bull's marketing campaign designed to bring more profits to Red Bull.

3        66.    Mr. Chambliss and his entity Chambliss Aerobatics, LLC had a duty to use that
4    degree of care that an ordinarily careful and prudent organizer of a performance of aerobatic flying
5    would use under the same or similar circumstances. In this case, Mr. Chambliss either individually
6    or through his entity Chambliss Aerobatics, LLC contracted for Mr. Andelin to perform at the Air
7    Show as part of "Team Chambliss" and sponsored by Red Bull. Mr. Chambliss and Chambliss
8    Aerobatics, LLC were negligent in failing to properly organize the aerobatic flying performed by
9    Team Chambliss, and specifically Mr. Andelin, at the practice session for the Iztapa air show on
10   January 24, 2020, and in failing to properly instruct and supervise Mr. Andelin as to how, when,
11   and where to safely perform aerobatic maneuvers. Mr. Chambliss's and Chambliss Aerobatics,
12   LLC's negligence in failing to properly instruct and supervise Mr. Andelin occurred both before
13   the fatal flight, and while Mr. Andelin was in the air piloting the Aircraft and performing the
14   improper aerobatic maneuvers at the practice session on January 24, 2020.

15       67.    By reason of its principal and agent relationship with Mr. Chambliss and Chambliss
16   Aerobatics, LLC,  Red Bull is vicariously liable for any and all actions and omissions of Mr.
17   Chambliss and Chambliss Aerobatics, LLC, including (1) their negligent and careless organizing
18   of the aerobatic flying at the practice session for the air show, (2) their failure to properly instruct
19   and supervise Mr. Andelin before the practice session for the air show, and (3) their negligent
20   failure to instruct and supervise Mr. Andelin while he was in the air piloting the Aircraft during the
21   practice session for the air show.

22       68.    Philip suffered grave bodily injuries as a direct result of Mr. Chambliss's and
23   Chambliss Aerobatics, LLC's negligence for which Red Bull is vicariously liable in all respects.

24       69.    Not only has Philip suffered catastrophic and permanent physical injuries, but the
25   emotional distress, suffering, anguish, fright, horror, nervousness, grief, anxiety, and worry he has
26   suffered and continues to suffer, particularly having been standing immediately next to his mother
27   and grandmother at the moment they were partially dismembered and killed, is enormous.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 17 -

COMPLAINT

70.     Plaintiffs Nelson and Philip further claim punitive damages which are appropriate in light of Mr. Andelin's extreme recklessness in piloting the Aircraft in total disregard of human life as part of Team Chambliss operated through Chambliss Aerobatics, LLC, and Mr. Chambliss's complete failure to organize the practice session and instruct Mr. Andelin as he flew for Team Chambliss, and in light of the fact that it is Red Bull's corporate policy, through its officers, directors, and managing agents, to encourage such extreme recklessness as a marketing strategy to increase sales of its product.

WHEREFORE, Plaintiffs Nelson Farr Bunker on behalf of his son Philip Agnew Farr, a minor, and Philip Agnew Farr, by his natural father and legal guardian Nelson Farr Bunker, pray judgment against Defendant Red Bull as follows:

(A)     For compensatory damages for all of Philip's injuries, including emotional pain and suffering, in an amount to be proven at trial;

(B)     For punitive damages in such sums as will serve to punish and deter Red Bull from future wrongdoing;

(C)     For prejudgment interest and post-judgment interest and costs; and

(D)     For such other and further relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all matters triable to a jury.

Dated: March 30, 2021

ROBINS KAPLAN LLP

By: _____
Roman M. Silberfeld

*Attorneys for Plaintiffs*
*Nelson Daniel Farr Bunker, et al.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 18 -

61771011.1

COMPLAINT

PROOF OF SERVICE

STATE OF CALIFORNIA        )
                           ) S.S.
COUNTY OF LOS ANGELES      )

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 4333 Park Terrace Dr. #100, Westlake Village, California 91361.

    On the date set forth below, I served the foregoing document described as **NOTICE OF REMOVAL OF CIVIL ACTION UNDER 28 U.S.C. SECTION 1331 (Federal Question)** on the interested parties in this action by presenting the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Roman M. Silberfeld, Esq.                    Attorneys for plaintiffs
Zac Cohen, Esq.
Robins Kaplan LLP
2049 Century Park East #3400
Los Angeles, CA 90067-3208
tel: (310) 552-0130; fax: (310) 229-5800
emails: RSilberfeld@RobinsKaplan.com; ZCohen@RobinsKaplan.com

[X]    (**Federal**) I declare that: [X] I am employed in the office of a member of the bar of this Court at whose direction this service is being made;  or [ ] I am a member of the bar of this Court.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[X]    (**CM/ECF**) Pursuant to the Rules of the United States Court Procedural Rules for Electronic Case Filing and the Case Management/Electronic Case Filing Rules, I electronically served the above-listed document on the parties shown above in this matter.

[]    (**FEDERAL EXPRESS**) I deposited such envelope at the Federal Express office located at Westlake Village, California.  The envelope was mailed fully prepaid.  I am "readily familiar" with firm's practice of collection and processing correspondence for mailing with Federal Express.  It is deposited with the Westlake Village Federal Express service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if cancellation date is more than 1 day after date of deposit for overnight mailing in affidavit.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    Executed on May 13, 2021 at Westlake Village, California.



Barbara Haussmann, CCLS
California Certified Legal Secretary